UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| United States of America | Hon. Joseph H. Rodriguez |
|  | Criminal No. 06-152 (JHR) |
| v. |  |
|  | **MEMORANDUM** |
| Vaughn Carstarphen | **OPINION** |
|  | **&** |
|  | **ORDER** |

This matter is before the Court on Defendant's Motion to Suppress Physical Evidence. For the reasons expressed below, Defendant's motion will be granted.

## FACTUAL BACKGROUND

On November 26, 2005, at approximately 1:30 pm, Camden Police responded to a 911 call from a female caller, reporting a group of individuals knocking on the door of 2823 Clinton Street in Camden, purportedly "wanting to fight." (See Government's Brief at 1; Defendant's Brief at 3.) 2823 Clinton Street is located in an area where many drug arrests have been made within a half-block radius and where prostitution and aggravated assaults have occurred within a five-block radius. (See Testimony of Officer Feliciano, Transcript[1] at 7-8, 33.) The officer patrolling the block on November 26, 2005 described it as a high-crime area. (See Testimony of Officer White, Transcript at 78-79.) However, another Camden police officer, who responded to a 911 call there later that day described the area as "quiet for the most part." (See Testimony of Officer Feliciano, Transcript at 7.)

---

[1] "Transcript" refers to the record of the motion hearing held December 18, 2006.

The 911 call was placed by Edna Daniels, an occupant of 2823 Clinton Street. (See Government's Brief, Exhibit 2, Camden Police Department Incident Report at 1.) Ms. Daniels informed the responding officer that the individuals were unknown to her. (See Testimony of Officer McCray, Transcript at 61-62.)  However, witness Wendy Roane, a friend of Ms. Daniels, testified that the individuals Ms. Daniels called about were her acquaintances, whom Daniels had requested come over to help her escape an abusive boyfriend.  (See Testimony of Wendy Roane, Transcript at 84-85.)

No individuals were present at the scene when the responding officer arrived. (See Government's Brief, Exhibit 2, Camden Police Department Incident Report at 1.) No description of the individuals was included in either the 911 call or the incident report prepared by the responding officer.  (See Government's Brief, Exhibits 1-2.)

At approximately 2:30 pm that same day, Ms. Daniels called 911 again, and reported several males outside her home.  (See Government's Brief, Exhibit 3.)   Ms. Daniels never identified this second group of individuals as being the same group that had prompted her to phone 911 the first time.  (See Government's Brief at 1; Defendant's Brief at 3.)  As per Ms. Daniels' description, the dispatcher released a radio dispatch, describing one male wearing a red and black shirt and another male wearing a red hat and possessing a firearm.  (See id.)

Uniformed Officers Feliciano and White, driving separately in marked police cars, responded to the second dispatch.  (See Testimony of Officer Feliciano, Transcript at 12.)  The officers arrived within minutes of the call.  (See Testimony of Officer White, Transcript at 80.)  While neither officer had responded to the first dispatch to Ms. Daniels' residence, both testified that they had heard it on the radio.  (See Testimony of Officer Feliciano, Transcript at 10-11; Testimony of Officer White, Transcript at 78-79.)

As Officer Feliciano arrived on the scene, he observed three males crossing Clinton Street. (See Testimony of Officer Feliciano, Transcript at 14.) One was wearing a red hat. (See id.) Officer White observed a second male wearing a black and white jacket and blue jeans, and a third male, Mr. Carstarphen, wearing an army jacket, black shirt, black wool cap, and blue jeans. (See Government's Brief, Exhibit 4 at 1; Testimony of Officer White at 69-71.) No other males were present in the area. (See Testimony of Officer Feliciano, Transcript at 14.)

As the officers exited their vehicles, the three males tried to enter a black Ford. (See id. at 16; Testimony of Officer White, Transcript at 75.) The officers drew their weapons on account of the report that one individual had a firearm, and because there were three suspects versus two officers on the scene. (See Testimony of Officer Feliciano, Transcript at 15-16.) The officers then ordered the three males to step away from the car. (See Testimony of Officer Feliciano, Transcript at 16; Testimony of Officer White, Transcript at 7.) Officer White and Ms. Roane both testified that Mr. Carstarphen was already inside the car by the time the police approached, and therefore needed to be ordered to step out of the car. (See Testimony of Officer White, Transcript at 76-77, and Testimony of Wendy Roane, Transcript at 87-88, 107-08.)

When the officers asked dispatch if the person with the weapon was the male in red, the dispatcher responded in the affirmative. (See Testimony of Officer Feliciano, Transcript at 27.) However, Officer Feliciano testified that he observed Mr. Carstarphen, who wore no red, with a bulge. (See Testimony of Officer Feliciano, Transcript at 17.) The officer believed the bulge could be a concealed weapon. (See id.) When Officer Feliciano frisked Mr. Carstarphen, he discovered a loaded gun. (See id. at 17-18.)

Ms. Roane testified that the officers did not find the gun on Mr. Carstarphen until they searched him a second time, after running his name. (See Testimony of Wendy Roane, Transcript at 114-15.)

## DISCUSSION

**A. When the Seizure of Mr. Carstarphen Occurred**

The seizure of Mr. Carstarphen occurred when the officers, pointing guns, ordered him out of the car. A seizure occurs when a suspect submits to "a show of authority" by the police. See United States v. Brown, 448 F.3d 239, 245 (3d Cir. 2006) (citing California v. Hodari D., 499 U.S. 621, 626 (1991)). A show of authority exists when a reasonable man would have understood the officer's words and actions to restrict his movement. Hodari D., 499 U.S. at 628. In Brown, the Third Circuit held that the defendant was seized when police informed him that a robbery victim was being brought over to identify suspects, and the defendant would be free to leave so long as he was not identified as a suspect. 448 F.3d at 245. The court reasoned that the officer's instructions implied that until the victim identification, the defendant was not free to leave. Id.

Here, when the police approached Mr. Carstarphen and his two companions with guns raised and ordered them away from the car, a seizure occurred. This seizure was more definitive than the seizure in Brown, in that here, not only did the officers' words imply that Mr. Carstarphen's physical movement was restricted, but their actions of pointing their guns confirmed it. Thus, Mr. Carstarphen was first seized not during the frisk of his person, but earlier, when the police stopped him from leaving the scene.

**B. Whether Police Had Reasonable Suspicion to Stop Mr. Carstarphen**

An investigatory stop by the police is consistent with the Fourth Amendment "when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000); see also Terry v. Ohio, 392 U.S. 1, 30 (1968) (holding that a police officer's search of citizens for weapons comported with the Fourth Amendment when the men paced twenty-four times outside a store and continuously looked in the store widow, and when, in light of the officer's experience, he reasonably believed the men to be poised to commit a daytime robbery).

In evaluating whether a police officer had reasonable suspicion to make a stop, the totality of the circumstances need to be considered. See, e.g., United States v. Cortez, 449 U.S. 411, 417 (1981) (finding that the essence of sufficient cause to authorize a stop "is that the totality of the circumstances– the whole picture– must be taken into account"). Moreover, a police officer's reasonable suspicion must be measured before the search, and cannot be filled in retroactively subsequent to the search. See, e.g., Florida v. J.L., 529 U.S. 266, 271 (2000) (holding that "[t]he reasonableness of official suspicion must be measured by what the officers knew before they conducted their search"). On this issue, the government bears the burden of proof by a minimal level of objective justification for the stop. United States v. Delfin-Colina, 464 F.3d 392, 396 (3d Cir. 2006).

Where an investigatory stop is based primarily on information provided to the police by an informant, the reasonableness of the stop depends on the reliability of the informant. United States v. Goodrich, 450 F.3d 552, 560 (3d Cir. 2006). In Goodrich, the Third Circuit found that despite an informant's vague tip, the police's previous

relationship with the informant, the informant's providing real-time narration of the suspicious behavior, and the suspicious activity matching a pattern of criminal activity of which the police were aware contributed to the reasonableness of the officer's decision to stop the defendant.  Id.   Additionally, the Third Circuit considered to be reliable, an informant who, in-person, tipped the police off about a street crime that happened only seconds before; the narrow window between the tip and the seizure allowed the police to base the reliability of the tip on the informant's voice and observable demeanor.  United States v. Valentine, 232 F.3d 350, 355-57 (3d Cir. 2000).  Conversely, the Supreme Court deemed an anonymous tip to be an unreasonable basis for a Terry stop when the unknown informant provided police with no insight into why he knew about the defendant or the defendant's gun, and therefore left the police without a means for testing his credibility.  J.L., 529 U.S. at 271.

Further, an investigatory stop is proper only when a police officer's reasonable suspicion of criminal activity leads the officer to target the particular person for the stop. Cortez, 449 U.S. at 417-18.  "An accurate description of a subject's readily observable location and appearance . . . does not show that the tipster has knowledge of concealed criminal activity." J.L., 529 U.S. at 272.  Thus, in J.L. the Supreme Court found a tip about  a young black male standing at a particular bus stop, wearing a plaid shirt, and carrying a gun an unreliable basis for reasonable suspicion, even though a police frisk of a black man in a plaid shirt at the bus stop described produced a gun.  See J.L., 529 U.S. at 267-74.

The Supreme Court stressed that the mere allegation that a person possesses a firearm will not justify a stop and frisk in the absence of other indicia of reliability.  J.L.,

529 U.S. at 272-73 (expressly rejecting a "firearm exception" to the Terry standard). The Court explained that

> an automatic firearm exception to our established reliability analysis would rove too far. Such an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anonymous call falsely reporting the target's unlawful carriage of a gun.

Id. at 272.

Even if a description provided by an informant is vague, sufficient particularity to target a specific person for an investigatory stop may exist when four factors are present: (1) reputation of the area where the stop occurred for a high level of criminal activity; (2) the time of day; (3) temporal and geographical proximity to the reported crime; and (4) the number of persons in the area. Goodrich, 450 F.3d at 561. In Goodrich, the Third Circuit held an investigatory stop to be proper when the defendants were found at 11:30 pm, within two blocks of a reported theft in an area known for the theft of chemicals used to make methamphetamines, and when no other persons were visibly present in the vicinity. Id. at 561-63. While the court in Goodrich did not hold that all four factors need to be present for an investigatory stop to be proper, the court did state that "where the police perform a Terry stop in an otherwise tranquil neighborhood during the daylight hours based only on a general description," constitutional concerns will be raised. Id. at 561.

Finally, if accompanied by some of the Goodrich factors discussed above, a suspect's avoiding the police may give officers reasonable suspicion to seize the suspect. While walking away from police does not evoke the reasonable suspicion that flight does, "it is a factor that can be considered in the totality of the circumstances."

Valentine, 232 F.3d at 357.  Thus, in Valentine, the Third Circuit ruled that the defendant's walking away, and eventual darting, from the police enhanced the officers' reasonable suspicion when the police had received an in-person tip at 1:00 am in an area definitively deemed high-crime.  Id. at 353, 357.

Here, given the totality of the circumstances of which the police were aware before they stopped Mr. Carstarphen, it is unlikely that the officers' stop of Mr. Carstarphen was reasonable.  As in Goodrich, the police here were working with a vague tip.  The responding officers knew only that there were several male suspects, one in a red hat with a firearm, and one in a red and black shirt.  (See Government's Brief, Exhibit 3.)  Unlike in J.L., the race of the suspect was never identified here.  Moreover, the suspects were never identified as the same ones who had prompted the first 911 call.  Thus, given the vagueness of the tip, stopping the three males on the basis of the dispatcher's description alone, when only one of the individuals matched the general description released by the dispatcher, was not reasonable.

In addition, the seizure of Mr. Carstarphen was not reasonable when judged by the reliability of Ms. Daniels' tip, since the officers had no reason to believe that Ms. Daniels was a reliable informant.  Unlike in Goodrich, where an ongoing relationship between the police and the informant gave police reason to rely on the informant's vague tip, this case is like J.L. in that the police had no reason to believe Ms. Daniels was credible.  Moreover, while the police here met Ms. Daniels in person, as happened in Valentine, the face-to-face meeting with Ms. Daniels carried less credibility than the in-person meeting in Valentine did, since minutes rather than seconds had passed between the tip and the police interacting with Ms. Daniels.  Basing credibility here on Ms.

Daniels' voice and demeanor consequently carried less weight than it did in <u>Valentine</u>. Thus, Ms. Daniels was like an anonymous informant, since she never identified to the police that she knew the victims, and therefore she gave the officers no reason for believing that she had inside information about the individuals. Further, since the officer who reported to the first 911 call at Ms. Daniels' home testified that complainants often become uncooperative and refuse to identify individuals they have reported, it would seem that standard operating procedure should have led the officers making the stop to do so with a presumption of Ms. Daniels' unreliability. (<u>See</u> Testimony of Officer McCray, Transcript at 62.)

In fact, Ms. Daniels proved herself the antithesis of a reliable informant. Specifically, Ms. Daniels told the officer who reported to her first 911 call that she did not know the individuals knocking on her door. (<u>See</u> Testimony of Officer McCay, Transcript at 61-62.) However, Ms. Daniels' friend, Wendy Roane, testified that Ms. Daniels did know the three men, and had in fact requested Ms. Roane to recruit them to help her escape her abusive boyfriend. (<u>See</u> Testimony of Wendy Roane, Transcript at 84-85.) Furthermore, when the officers came upon the scene after Ms. Daniels' second call, they observed three males, and although one was wearing a red cap, none was dressed in a red and black shirt, as described by Ms. Daniels in the 911 call. Ms. Daniels' credibility was further undermined by the fact that Mr. Carstarphen was not the male she identified as having a gun, since he wore no red. In this way, this case is less strong than <u>J.L.</u>, since there the defendant possessing the gun actually matched the description of the gun possessor, in that he was a black male, in a plaid shirt, at a specific bus stop. Thus, in the absence of a reason to believe that the Ms. Daniels was reliable, it was

9

unreasonable for the reporting officers to stop Mr. Carstarphen on the basis of her tip.

Since reasonableness should be analyzed under the totality of the circumstances, the fact that the police here relied on a vague tip from an unreliable informant should not be dispositive in determining whether evidence should be suppressed. The presence of the four factors set out in Goodrich could make the stop proper, even in the absence of a precise description provided by a reliable informant. Notably, the Third Circuit in Goodrich did not mandate that all four factors be present for an investigatory stop to be constitutionally permissible. However, since only two of the Goodrich factors exist here, the stop of Mr. Carstarphen must be held unconstitutional.

In this case, it is debatable whether the 2800 block of Clinton Street is a high crime area. While the officer patrolling the block on the day of the incident described it as a high crime area, (see Testimony of Officer White, Transcript at 78-79), an officer who responded to the second 911 call described the block as "quiet for the most part," (see Testimony of Officer Feliciano, Transcript at 7). This contrasts with Valentine, where the officers had offered uncontradicted testimony that a lot of shootings occurred in the very bad neighborhood where they had seized the defendant. Valentine, 232 F.3d at 352. Next, unlike in Goodrich, where the seizure occurred at 11:30 pm, or in Valentine, where the seizure occurred at 1:00 am, the frisk here was made in the middle of the afternoon. This midday hour does not support a reasonable inference of criminal activity as the nighttime hours in Goodrich and Valentine did. On balance, however, Mr. Carstarphen's position across the street from the alleged crime scene and the fact that he and his two friends were the only males on the block do support an inference of criminal

activity[2]. Considering the Goodrich factors, constitutional concern is raised in that the police frisked Mr. Carstarphen based on a general description, in the daylight hours, on a block that at least one officer described as "quiet for the most part." This is especially so considering that the very factors missing here are those that the Third Circuit in Valentine held to be dispositive to the officers' reasonable suspicion.

Next, the Court considers relevant, but not dispositive, the circumstance that Mr. Carstarphen and the other two males began to get into their car when the officers arrived at the scene. While the defendant in Valentine also attempted to avoid the police, Valentine is distinguishable because there, the defendant's response to the attempted stop by the police was to "charge" away from them. Valentine, 232 F.3d at 353. The defendant's flight in Valentine contrasts with Mr. Carstarphen's compliance with police orders.

Finally, the Court is most considerate of Officer Feliciano's testimony that he observed a "bulge" on Mr. Carstarphen that he thought, in light of his and experience and training, may have been a weapon. However, while the police may have had suspicion for a frisk based on the observation, this does not justify the initial stop of Mr. Carstarphen, since the police could not have seen the bulge prior to his stepping outside the car. Notably, Feliciano's observation of a "bulge" occurred after the three individuals submitted to a show of force, by stepping away from the vehicle at the direction of the

---

[2] In New Jersey, until it is established otherwise, it is presumed that someone carrying a handgun does not have a permit to possess the gun as required by N.J. Stat. Ann. § 2C:39-5(b). N.J. Stat. Ann. § 2C:39-2(b). Thus, there is no question that possessing a gun qualifies as criminal activity in this context. Valentine, 232 F.3d at 357.

11

officers, whose guns were drawn. The seizure in this case, as discussed above, initially took place when the officers drew their guns and ordered the three individuals to move away from the vehicle. The Court finds that, under the totality of the circumstances, considering the facts available to the officers at the moment of seizure, the officers did not have a reasonable, articulable suspicion that criminal activity was afoot. As such, any evidence obtained pursuant to the investigatory stop must be suppressed as "fruit of the poisonous tree," Wong Sun v. United States, 371 U.S. 471, 487-88 (1963), and the Defendant's motion is therefore granted.[3]

## CONCLUSION

For these reasons,

IT IS ORDERED on this 25th day of June, 2007 that Defendant's motion to suppress physical evidence is hereby GRANTED.


    /S/ Joseph H. Rodriguez
JOSEPH H. RODRIGUEZ
U.S.D.J.

---

[3] The above analysis does not consider the testimony of Wendy Roane that Mr. Carstarphen was actually frisked twice and the gun was not found on the first frisk. (See Testimony of Wendy Roane, Transcript at 114-15.)